IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
February 22, 2006 Session

# GAIL A. PEGUES v. SHELBY COUNTY CIVIL SERVICE MERIT BOARD, ET AL.

**A Direct Appeal from the Chancery Court for Shelby County**
**No. CH-04-1754-1     The Honorable Walter Evans, Chancellor**

---

**No. W2005-02074-COA-R3-CV - Filed May 12, 2006**

---

This case arises from the decision of the Shelby County Civil Service Merit Board to terminate the employment of Gail Pegues, a Shelby County Buyer-Program Specialist. The Shelby County Chancery Court upheld the decision of the Civil Service Merit Board to terminate Ms. Pegues employment. She appeals. We affirm.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Affirmed**

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which DAVID R. FARMER, J. and HOLLY M. KIRBY, J., joined.

John D. Horne of Memphis, Tennessee for Appellant, Gail A. Pegues

Debra L. Fessenden, Assistant Shelby County Attorney, for Appellee, Shelby County Civil Service Merit Board and Shelby County Government

**OPINION**

On October 1 1991, Gail Pegues ("Appellant") was hired by the Shelby County Government ("County") as a Buyer-Program Specialist B in the Purchasing Department.[1] The County's Purchasing Department purchases all goods, supplies and services for the County. As a Buyer in the Purchasing Department, Ms. Pegues's job involved reviewing requisitions, finding vendors to provide products and services, reviewing bids to find the lowest and best bids for the County, and recommending vendors to receive County contracts. Because of the nature of their jobs, buyers are required to report possible conflicts with vendors so that a supervisor can ensure that the bid decisions are made impartially. In addition, the County requires all employees to report and receive approval for outside employment in order to ensure that there is no conflict.

---

[1] Ms. Pegues was initially employed as a Program Administrator D.

In May of 2003, the County enacted a Code of Ethical Conduct for Employees of Shelby County, Tennessee (the "Code of Conduct"). On July 23, 2003, Ms. Pegues was presented with a copy of the Code of Conduct, and, on that same day, she gave written verification that she had received the Code of Conduct. Prior to the enactment of the Code of Conduct, in February of 2003, Ms. Pegues attended an informational breakfast. At that meeting, Ms. Pegues had a conversation with Shirley Herron Alexander, a representative of the Raleigh Family Development Center. Ms. Alexander was seeking a particular contract from the County but did not have the necessary TennCare certification. On September 8, 2003, Ms. Alexander wrote the following letter to Ms. Pegues's employer. The letter reads, in relevant part, as follows:

> Following the dismissal [of the February informational meeting], I [Ms. Alexander] was approached by Gail P[e]gues, who identified herself as a purchasing agent for Shelby County. She submitted a card with the name and number of a person whom she stated would be able to acquire the TennCare certification for us. We arranged to meet this person who identified himself as Dr. Robert Jacox.... This man...further described himself as "Gail's business partner." This declaration caused us to believe this avenue [was] a venture of Shelby County to assist minority businesses in acquiring the appropriate credentials to better prepare them for contract negotiation. His fee would be $1200 to acquire the certification which was discounted because of Gail's recommendation. He would accept $600 down and the rest upon delivery. I met with Dr. Jacox on several occasions providing him various documentation concerning our agency. According to him these things were needed to complete the process. Ms. P[e]gues would call and confer with Dr. Jacox at least twice during my meetings with him by cell. These "business calls" added to his credibility and to his connection with Shelby County (So I thought). During one of these meetings with Dr. Jacox, Ms. P[e]gues called and informed him that Raleigh Family Redevelopment had been given the contract with Oakville pending the certification. Dr. Jacox then added some other financial requirements. He wanted a percentage of our first payment. He then related things that didn't sound "kosher". He aksed for my "sworn confidentiality".... He stated that Gail would deliver any contract the two of them agreed upon for money. This was their "modus operendus" [sic]. She would refer people to him, he would guaranty the contract, negotiate a fee, she would deliver the contract. He would then collect the fee and divide the proceeds with Gail.... Naively, I called Gail to advise her of the dangerous things this man had alluded to involving her. She denied the allegations and stated she was not in a position to deliver contracts and did not know what he was talking about. However, when I questioned Dr. Jacox's ability to produce the certification,

> Gail said she had seen our paperwork from Nashville. By this time June is fast approaching and no proof of certification has presented. I called Dr. Jacox to check on the status of the certification and he asked to meet with me. He reassured me I had nothing to worry about as the final points were in place. He then revealed a contract with the signature of a local pastor [Pastor White] whom I knew personally.... When I contacted [Pastor White], he mentioned Gail, but would not divulge her position. He simply said "she is in with him". By this time, I felt a part of a "scheme".... The following weeks, Dr. Jacox called me furious that I had informed Gail of his allegations toward her. He said that information was confidential and I should not have related what he said to Gail because now she feels him untrustworthy. At that point I began to ask for a refund due to their inability to produce the TennCare certification. I have given Gail every opportunity to refund Raleigh's money not desiring to make trouble for her on her job. She has repeatedly refused to divulge [Dr. Jacox's] address or phone number by stating he lives "up north". Two weeks ago I sent her a registered letter giving her ten days to respond. There has been no answer....

This letter was turned over to the Shelby County Attorney's office, and an investigation began. On September 26, 2003, the Shelby County Attorney's office took a sworn statement from Ms. Pegues. In this statement, she admitted to knowing Dr. Jacox as a "business consultant" but denied any business relationship with him. Ms. Pegues admitted that she referred Ms. Alexander to Dr. Jacox, but denied that she had shared any fees Ms. Alexander may have paid with Dr. Jacox. Ms. Pegues also stated that she had no other employment during her tenure with the County. Following the taking of this sworn statement, the Deputy County Attorney sent a letter, dated February 10, 2004, to Ms. Pegues's supervisor, Sybille S. Noble. The letter advised Ms. Noble concerning Ms. Pegues's material admissions and denials contained in the sworn statement. The letter indicated that the County Attorney's Office had contacted Pastor White, who is mentioned in Ms. Alexander's letter (*see supra*), and that he had stated that he had attended several meetings with Dr. Jacox and Ms. Pegue concerning "various proposals and consulting services." Pastor White also stated that his church had paid between two and three thousand dollars [to Dr. Jacox], but that the promised services had not been performed and the money had not been returned. The Deputy County Attorney noted that the pastor's statements were "identical in scope to the substance of Ms. Alexander's complaint." The Deputy County Attorney also indicated that the conversation with the pastor raised "questions about Ms. Pegues's truthfulness in her sworn statement...[as she emphatically denied any business relationship with Dr. Jacox while a document provided by Pastor White] clearly indicates that Ms. Pegues is or was the Executive Assistant to Dr. Jacox."[2]

---

[2] The document provided by the pastor is a cover sheet of Urban Planning and Associates, the organization allegedly headed by Dr. Jacox. The cover sheet reads "Gail Pegues–Executive Assistant."

On February 18, 2004, the Deputy County Attorney took a second sworn statement from Ms. Pegues. Although she initially denied having any business relationship with Dr. Jacox, when questioned further Ms. Pegues stated that "she did not consider doing extra, extracurricular activities as a business relationship or a business opportunity." However, she did concede that, as of March 10, 2003, Dr. Jacox considered Ms. Pegues as having a business relationship with him as executive assistant–an admission that would allegedly explain the cover letter of Urban Planning and Associates, *see* footnote 2. Following the second sworn statement, the Deputy County Attorney again notified Ms. Noble by letter dated February 27, 2004. This letter points out the numerous inconsistencies between the first sworn statement and the second.

On March 12, 2004, Ms. Noble sent a letter to Ms. Pegues indicating that Ms. Pegues would be terminated "subject to your civil service rights of appeal," or that Ms. Pegues could "voluntarily resign upon sixty (60) days notice." When Ms. Pegues did not resign, Ms. Noble wrote to the Deputy County Attorney, on March 16, 2004, notifying him that she was recommending terminating Ms. Pegues "for violations of [certain] terms and conditions of the Code of Ethical Conduct for Employees of Shelby County." The memorandum went on to specifically list four (4) alleged violations of the Code of Conduct, to wit:

1. An indirect conflict in which the employee used her public office other than in accordance with law and policy for the gain or benefit of another.

2. The use of her County position to endorse a service that benefitted another with whom the employee was affiliated in a nongovernmental capacity;

3. Participation in a matter that had a direct effect on the financial interests of a prospective employer, without first obtaining the authorization of her Division Director; and

4. Failure to obtain prior written approval from the Division Director before engaging in non-conflicting outside employment.

Following a meeting with the Deputy County Attorney, Ms. Noble notified Ms. Pegues, by letter of March 18, 2004, that the County intended to terminate Ms. Pegues's employment "due to actions taken by [Ms. Pegues] in violation of the County's Ethics Policy and Principles and Standards of Ethical Supply Management Conduct." By letter of March 30, 2004, Ms. Pegues was officially terminated from County employment.

Following her termination, Ms. Pegues filed a timely request to the Civil Service Merit Board (the "Board," and together with the County, "Appellees") to appeal the disciplinary action taken by the County. The Board granted a hearing, which was held on July 28, 2004. Following the hearing, the Board notified Ms. Pegues, by letter of July 29, 2004, that it would uphold the termination based

upon the evidence presented at the hearing. On or about September 8, 2004, the Board issued its "Decision".

On August 30, 2004, Ms. Pegues filed a "Petition for Writ of Certiorari & Supercedeas" with the Chancery Court of Shelby County. The County objected to this Writ on the basis that it was premature (i.e. it was filed before the Board's "Decision" was filed on or about September 8, 2004). The trial court determined that the September 8, 2004 "Decision" was final and, consequently, allowed Ms. Pegues to file an amended petition. On June 7, 2005, Ms. Pegues filed her "First Amended Petition for Writ of Certiorari & Supercedeas" (the "Amended Petition"). On June 16, 2005, the County filed its Answer to the Amended Petition. The Amended Petition was heard by the trial court on July 27, 2005. On July 29, 2005, the trial court entered its "Order Denying Petition for Writ of Certiorari," which reads, in pertinent part, as follows:

> 1. The Petitioner was not denied her procedural rights to a fair hearing before the Shelby County Civil Service Merit Board.
>
> 2. That the decision of the Shelby County Civil Service Merit Board was not arbitrary, capricious, illegal and it did have a basis in fact based on the record produced at the Petitioner's hearing.
>
> 3. That the Shelby County Civil Service Merit Board set forth sufficient findings of fact to support its decision based on the testimony and evidence adduced at the Petitioner's hearing.
>
> 4. That the Court had no legal basis to reverse the decision of the Shelby County Civil Service Merit Board.
>
> 5. That the decision of the Shelby County Civil Service Merit Board is affirmed and the Petition for Writ of Certiorari is denied.

Ms. Pegues appeals and raises the following issues for review as stated in her brief:

> 1. Was the July 29, 2004 letter ruling of the Shelby County Government Civil Service Merit Board...the ruling from which Petitioner was entitled to seek appellate review?
>
> 2. Did the Trial Court commit error by finding the September 8, 2004 "decision" of the Civil Service Merit Board...to be the ruling from which the Petitioner was entitled to seek appellate review?
>
> 3. Was the Shelby County Government Civil Service Merit Board entitled to supplement its July 29, 2004 ruling by the "Decision"

dated September 8, 2004, after jurisdiction of this dispute had been assumed by the Trial Court?

4. Was there material evidence in the record to support the decision of the Trial Court to uphold the termination of the Petitioner's employment?

5. Did the Shelby County Government Civil Service Merit Board act arbitrarily and capriciously in terminating the Petitioner's employment?

We first address Ms. Pegues's issues concerning whether the July 29, 2004 letter from the Board, or its subsequent "Decision" of September 8, 2004, is the final order or judgment from which appeal may be taken pursuant to T.C.A. §27-9-101.[3] Ms. Pegues argues that the letter was a final order or judgment. Consequently, she contends that the Board failed to provide her with a detailed decision setting forth the basis of its ruling. We disagree. The July 29, 2004 letter, *see supra*, states that "[a]n official order from the Board should be completed and received by all parties in the near future." This statement is not ambiguous. By its letter, the Board was merely providing Ms. Pegues with its result at the earliest possible time. However, the letter, by its own terms, is not the final order of the Board. Consequently, we find that Ms. Pegues acted prematurely in filing her appeal from the letter and not waiting until the Board had issued the decision promised in the letter. Recognizing that the filing to the trial court was premature, the County filed a Motion to Dismiss. Faced with this motion, the trial court allowed Ms. Pegues to amend her original Petition to reflect an appeal from the September 8, 2004 "Decision." We cannot find that the trial court erred, or overstepped its jurisdiction, in so doing. Because the Board had not issued its final decision at the time of the filing of Ms. Pegues's original Petition, the Board retained jurisdiction to issue its decision. From the record, it appears that the September 8, 2004 "Decision" is the final order or judgment of the Board. Consequently, this "Decision" is the only order or judgment subject to a Petition for Writ of Certiorari in this matter. Ms. Pegues also asserts the Board's decision must be reversed because it was signed by assistant secretaries to the Board, who are county employees, rather than by the Board members themselves. Ms. Pegues does not, however, suggest that the findings in the September 8, 2004 "Decision" were actually made by the secretaries rather than the Board itself. Rather, Ms. Pegues's assertion, as we understand it, is that the secretaries's signatures on the decision are insufficient to certify it under the civil service merit act. Although allowing secretaries of the Board to sign Board decisions may not be the best practice, neither Ms. Pegues nor the Board alleges that the decision in the record does not accurately reflect the Board's

---

[3] T.C.A. §27-9-101 reads:

> Anyone who may be aggrieved by any final order or judgment of any board or commission functioning under the laws of this state may have the order or judgment reviewed by the courts, where not otherwise specifically provided, in the manner provided by this chapter.

determinations. Any procedural error would, therefore, be technical, non-prejudicial, and, consequently, harmless.

Ms. Pegues also appeals from the trial court's dismissal of a common law writ of certiorari. Such a writ is available from administrative decisions where an administrative board or agency is acting in a judicial or quasi-judicial capacity. *Davison v. Carr*, 659 S.W.2d 361, 363 (Tenn.1983). T.C.A. § 27-8-101 (2000) provides:

> The writ of certiorari may be granted whenever authorized by law, and also in all cases where an inferior tribunal, board, or officer exercising judicial functions has exceeded the jurisdiction conferred, or is acting illegally, when, in the judgment of the court, there is no other plain, speedy, or adequate remedy.

The court's review under such a writ is limited to whether the inferior board or tribunal exceeded its jurisdiction or acted illegally, arbitrarily, or fraudulently. *McCallen v. City of Memphis*, 786 S.W.2d 633, 640 (Tenn.1990). The reviewing court does not re-weigh the evidence, but must uphold the board's decision if the board acted within its jurisdiction, did not act illegally or arbitrarily or fraudulently, and if there is any material evidence to support the board's findings. *Watts v. Civil Serv. Bd. of Columbia*, 606 S.W.2d 274, 276-77 (Tenn.1980); *Davison*, 659 S.W .2d at 363. These determinations are issues of law. *Watts*, 606 S .W.2d at 277. Our review of the trial court's conclusions on matters of law is *de novo* with no presumption of correctness. *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn.2000); Tenn. R. App P. 13(d).

The issue to be decided by the Board was whether there was just cause to terminate Ms. Pegues's employment. *See Case v. Shelby County Civil Service Merit Bd.*, 98 S.W.3d 167, 175 (Tenn.Ct.App.2002). This Court has noted that the term "just cause" must be based on what is fair and reasonable. *Id*. We have also observed that cause relates to something substantial that would render continued employment detrimental. *Id*. Although the burden of demonstrating cause is on the employer, the administrative board reviewing the termination must consider the record as a whole to determine whether cause exists. *Id*. at 176. Upon review, this Court will not weigh the evidence but will affirm the decision of the Board if it is supported by substantial and material evidence. *Id.* at 172.

From our review of the record, we agree with the trial court that the record contains substantial and material evidence to support the Board's determination. We first note that there are numerous discrepancies between Ms. Pegues's sworn statements and her testimony before the Board. In her first sworn statement, Ms. Pegues admits that she referred Ms. Alexander to Dr. Jacox, to wit:

> Q. Okay. So it's your [Ms. Pegues's] testimony that you were approached by Miss Alexander at the seminar?
>
> A. Right.

Q. Who then asked you if you could help her or advise her as to how to get what kind of certification?

A. At the time she was, she was trying to bid on something. I can't remember that. And I told her to see Seville before she left, maybe she could help her out.

I think she talked to Seville. And then I said, I said, I referred her to Dr. Jacox: "Maybe he will be able to help you."

In this same statement, she also admits to referring other people to Dr. Jacox; however, in her second sworn statement, she claims that the referrals were for personal matters and not for business purposes.

Ms. Pegues further testified that she was aware that Dr. Jacox had used her name in dealings with Pastor White, to wit:

Q. All right. If you'll [Ms. Pegues] read this top line for me, please, out of Exhibit B.

A. "Urban Planning and Associates."

Q. What's underneath that?

A. "Gail Pegues, Executive Assistant."

Q. Gail Pegues, is that Gail Pegues you?

A. I don't know if it's me. That's my name.

Q. Is there any other Gail Pegues we're familiar with here?

*                            *                            *

A. Not that I know of.

Q. Associated with Dr. Jacox, is there more than one Gail Pegues working with Dr. Jacox?

A. Sir, I'm not working with him.

*                            *                            *

-8-

Q. Then explain for me why it is that your name is listed as executive assistant to his organization?

A. Because Dr. Jacox prepared this. This was contingent upon us forming the organization, which was never formed.

Q. Well, I believe you just testified, Ms. Pegues, that the job offer was for the Board of Directors on the church, not to work for Dr. Jacox.

A. Right. It was never formed, sir.

Q. That's not the question. Your statement was that you attended the meeting with Pastor White to discuss a board position with the church of Pastor White?

A. No–Bloomfield Christian, right. That's correct, with this organization.

Q. And this is not the organization of Pastor White. Urban Planning and Associates is Dr. Jacox's organization, not Pastor White; correct?

A. That's correct.

\*                                    \*                                    \*

Q. But your name is listed as executive assistant to Urban Planning and Associates, which is Dr. Jacox; correct?

A. That's correct.

Q. So you're going to sit here and tell me that you don't have any business relationship with Dr. Jacox through that organization?

A. Sir, Dr. Jacox and I have had a confrontation about this on numerous occasions, on numerous occasions.

Q. Well, tell me about those confrontations.

A. When I first started this proposal, he put this together. I had nothing to do with it. He put my name on this. We've had–I've even threatened to go to an attorney on this.

Q. Why didn't you mention this to me on September 26th when I asked you about it?

\* \* \*

A. I didn't think about it at the time.

Ms. Pegues also testified that she had spoken to Ms. Alexander about Dr. Jacox's whereabouts, and that she had also received Ms. Alexander's certified letter asking for a refund of the money Ms. Alexander had given to Dr. Jacox. Ms. Pegues asserts that this money was for a "family matter," but would not divulge the nature of that matter to the Board. It is undisputed in the record that Ms. Pegues did not report Dr. Jacox use of her name and position on his organization's letterhead, nor did she discuss receipt of the letter from Ms. Alexander with her supervisor.

In her argument on appeal, Ms. Pegues makes much of the fact that the Shelby County Code of Ethical Conduct was not adopted by the County until some time after the events giving rise to Ms. Pegues's termination occurred. While this is true, Ms. Pegues's supervisor, Ms. Noble, testified before the Board that, regardless of the Code of Conduct, that any Buyer should know that she should not promise County contracts to vendors if they were paying money to the Buyer's associate to assist in document preparation. Furthermore, a Buyer who discovered that someone was falsely using her name, position, or relationship in an unethical manner, should immediately report this to her supervisor. Ms. Nobles testified that such concepts are basic, "Purchasing 101," and that Ms. Pegues was aware of them. We agree. From the record before us, we find that there is sufficient evidence to support the Board's determination that Ms. Pegues was engaging in some sort of business dealings with Dr. Jacox, that she used her position with the County to further this relationship, that she failed to discuss this relationship with her supervisors, and that she gave inconsistent and evasive answers concerning the exact nature of her dealings with Dr. Jacox. Given the nature of Ms. Pegues's position with the County, we find that any one of these acts or omissions would constitute a sufficient basis for her termination.

Ms. Pegues next argues that the Board's decision was arbitrary and capricious, and in violation of her due process rights. Specifically, she asserts that Ms. Noble was "intent upon terminating" Ms. Pegues. From the record before us, we must disagree. Ms. Pegues notes that the performance evaluation completed by Ms. Noble in July 2003 gave Ms. Pegues above average ratings. We note, however, that this performance evaluation was received prior to the time Ms. Noble became aware of the allegations leading to Ms. Pegues's termination. If anything, this performance evaluation supports a finding that Ms. Noble had no problems, either from a personal or business standpoint, with Ms. Pegues prior to receiving Ms. Alexander's letter. We now turn to the record to determine whether Ms. Pegues's due process rights were otherwise violated during the course of these proceedings.

It is undisputed that Ms. Pegues was a classified employee in the Shelby County civil service whose terms of employment were governed by the Shelby County Civil Service Merit Act as enacted

by 1971 Tenn. Priv. Act ch. 110. The Merit Act stipulates that classified county employees may be terminated only for just cause. 1971 Tenn. Priv. Acts ch. 110 § 21. Such employees possess a property interest in their continued employment which may not be deprived by the State without due process. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538-39, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). The question which arises in this case concerns what process is therefore due.

The most fundamental element of due process is "the opportunity to be heard 'at a meaningful time and in a meaningful manner.' " *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965)). "[N]otice and opportunity for [a] hearing appropriate to the nature of the case" must precede the "deprivation of life, liberty or property." *Loudermill*, 470 U.S. at 541, 105 S.Ct. 1487 (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313, 70 S.Ct. 652, 94 L.Ed. 865 (1950)). "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Mathews*, 424 U.S. at 334, 96 S.Ct. 893 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972)).

Following receipt of Ms. Alexander's letter, the record indicates that Ms. Noble followed proper procedure. She referred the matter to her supervisor, and also notified the County Attorney's office. The Deputy County Attorney took two sworn statements from Ms. Pegues. During the course of these statements, Ms. Pegues was given ample opportunity to explain her relationship with Dr. Jacox, Ms. Alexander, Pastor White, and others. When documentation arose that contradicted her first sworn statement (i.e. the Urban Planning and Associates letterhead), she was given the opportunity at her second sworn statement to refute this evidence. Only after this second statement did the Deputy County Attorney finalize his investigation.

Ms. Noble's correspondence of March 12, 2004 indicates that she and Ms. Pegues had met on March 1, 2004 and discussed "the possibility" of proceeding with termination or resignation within sixty (60) days. The record indicates that Ms. Pegues did not contact Ms. Noble, but was nonetheless given additional time to come to a decision.

On March 16, 2004, Ms. Noble corresponded with the County Attorney office and set out the facts of the investigation, the policies Ms. Pegues was believed to have violated, etc. A copy of this memo was sent to County Mayor, A.C. Wharton, Jr. who, on March 18, 2004, wrote that he concurred with the recommendation to terminate Ms. Pegues. Thereafter, by letter of March 18, 2004, Ms. Pegues was notified that Ms. Noble was considering termination. She was advised concerning the exact nature of her violations, *see supra*. Ms. Pegues was also notified of the date of her *Laudermill* hearing; however, she did not attend. Thereafter, Ms. Pegues was notified in writing of her termination, and was advised of her appeal options. She was notified of the Board hearing. She attended, and participated, in that hearing. From the record before us, we cannot say that proper procedure was not followed in this case, or that Ms. Pegues's due process rights were violated in any way. Rather, we find that the Board's decision was fair, reasoned, lawful, and based on sufficient, material evidence.

For the foregoing reasons, we affirm the Order of the trial court.  Costs of this appeal are assessed against the Appellant, Gail Pegues, and her surety.

_____
W. FRANK CRAWFORD, PRESIDING JUDGE, W.S.